**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

CANDACE E. ALSTON,

    Plaintiff,

    v.

EQUIFAX INFORMATION SERVICES, LLC,

    Defendant.

Civil Action No. TDC-13-1230

**MEMORANDUM OPINION**

Plaintiff Candace E. Alston has filed suit against Defendant Equifax Information Services, LLC ("Equifax") based on its reporting on Alston's Equifax credit report of a Wells Fargo mortgage account and a Discover credit card account, and based on Equifax's reinvestigation into those accounts in response to Alston's disputes. Pending before the Court are Alston's Motion for Partial Summary Judgment and Equifax's Cross-Motion for Summary Judgment. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Alston's Motion for Partial Summary Judgment is DENIED, and Equifax's Cross-Motion for Summary Judgment is GRANTED.

**BACKGROUND**

## I. The Wells Fargo Mortgage

### A. Mortgage Servicing and Payments

On November 12, 2010, Alston obtained a mortgage loan from Monarch Bank ("Monarch") in the amount of $102,212.00 for a property located at 7929 Mandan Road, Unit

304, in Greenbelt, Maryland. On November 16, 2010, the resulting Deed of Trust, made out to Monarch, was recorded in the Prince George's County Circuit Court Land Records. In a document dated November 12, 2010, the date she signed the original loan documents, Alston unilaterally executed a rider to the Deed of Trust ("Rider"). The Rider included the following provision:

> Any offset or claim which Borrower has now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

Alston Rider, Prince George's County Land Records, Book 32280 at 502.[1] On December 29, 2010, Alston had a copy of the original Deed of Trust and her unilateral Rider recorded in the county land records, annotating the original Deed with the note "re-record to add deed of trust rider." *Id.* at 487.

On December 16, 2010, Monarch sold Alston's mortgage to Wells Fargo. In a letter dated December 17, 2010, Monarch informed Alston that the first payment on her mortgage was due on January 1, 2011, that her loan was being transferred to Wells Fargo, that she should begin remitting payments to Wells Fargo beginning on February 1, 2011, and that any payments due before that date should be remitted to Monarch. In a letter dated December 27, 2010, Wells Fargo informed Alston that her mortgage had been transferred from Monarch, that the transfer would become effective on February 1, 2011, and that beginning on that date, she should remit her mortgage payments to Wells Fargo. At some point "well before" January 20, 2011, Monarch shipped the original promissory note underlying the mortgage to Wells Fargo. Equifax Mot. Summ. J. ("Equifax Mot.") Ex. 4H at 19-20, ECF No. 114-14. Although Alston's mortgage had

---

[1] The Court takes judicial notice of land records pursuant to Federal Rule of Evidence 201(b)(2).

been sold to Wells Fargo, the promissory note ("Note") was mistakenly endorsed to Bank of America. By July 2011, that error was corrected, and the Note was endorsed to Wells Fargo.

In December 2010, Alston began to send her $811.53 monthly loan payments to Monarch, the first of which was due in January 2011. Each of the payments that she sent was annotated with the land records book and page number corresponding to the Deed of Trust and unilateral Rider that Alston had executed. Early checks expressly indicated that cashing the check constituted acceptance of the terms of the Rider. Later versions contained only the land records book and page number. Monarch returned those checks to Alston, informing her that they would not accept any such conditional payments. As a result, Alston had a past due balance with Monarch for the January 2011 payment. Although Wells Fargo took over servicing of Alston's mortgage on February 1, 2011, Monarch continued to send Alston billing statements through April 2011 because of her overdue January 2011 balance.

On August 4, 2011, Alston submitted to Monarch a cashier's check for $6,492.24, representing eight monthly payments of $811.53. The check was made payable to "Monarch Mortgage, Deed of Trust Book 32280, pp. 487-504," the land deed entry that included Alston's unilateral Rider. Alston Mot. Summ. J. ("Alston Mot.") Ex. 14 at 5, ECF No. 112-16. Alston also annotated the payment coupon with "Deed of Trust Book 32280, pp. 487-504." *Id.* Rather than returning the cashier's check to Alston, Monarch endorsed it and forwarded it to Wells Fargo. Wells Fargo refused to accept the check.

Meanwhile, Alston was disputing Wells Fargo's ownership of her mortgage. Beginning on January 20, 2011, Alston sent a series of letters to Wells Fargo demanding evidence that Wells Fargo was entitled to enforce the promissory note relating to her mortgage. Wells Fargo repeatedly responded with assurances that it was the valid servicer of her loan, and on multiple

occasions it sent her copies of the Note and Deed of Trust, including, in July 2011, a copy of the Note that had a proper endorsement to Wells Fargo.

On September 7, 2011, Wells Fargo demanded that Monarch repurchase the loan, asserting that the sale of the loan to Wells Fargo violated various representations, including a representation that the loan did not involve fraud. Wells Fargo explained to Monarch that Alston had refused to submit any unconditional payments on the loan, continued to challenge Wells Fargo's right to service the loan, and had executed a deed and rider that "attempt[ed] to change the loan terms." Equifax Mot. Ex. 4J at 2-3, ECF No. 116-16. Monarch conceded that it was "becoming increasing[ly] clear that the borrower may have obtained the loan with the intention of not repaying it" and agreed to the repurchase. *Id.* at 2. The loan was officially transferred back to Monarch on October 28, 2011, along with Alston's August 2011 cashier's check.

During this period, Wells Fargo reported Alston's mortgage as delinquent. Specifically, Wells Fargo reported that each monthly payment from April 2011 to October 2011 was past due, with the exception of the August 2011 payment. In August 2011, after Alston's cashier's check had been forwarded to Wells Fargo from Monarch, Wells Fargo reported the account as current.

From February 2011 to October 2011, when Wells Fargo was the servicer of Alston's loan, Alston sent no payments to Wells Fargo. All payments Alston sent to Monarch during this period were conditioned on acceptance of the terms of her unilateral Rider.

### B.    Disputes with Equifax

On June 30, 2011, Alston ordered her credit report from Equifax, a consumer reporting agency ("CRA"), and discovered that it was reporting that she had a delinquent mortgage account with Wells Fargo. On July 17, 2011, Alston filed an online dispute about the account in which she asserted that "Wells Fargo does not own or service my account." Alston Mot. Ex. 17,

ECF No. 112-19; *see id.* Ex. 13, ECF No. 112-15 (list of disputes).  In response, Equifax sent an "Automated Consumer Dispute Verification" ("ACDV") to Wells Fargo in which it stated that Alston was asserting that "Wells Fargo does not own or service my account" and requested that Wells Fargo verify the account information.  Alston Mot. Ex. 17.  Wells Fargo verified that Alston had a mortgage account with it and indicated that Equifax should modify its report to reflect that she became delinquent on that account beginning in February 2011 and that she was currently 150 days past due.  On August 11, 2011, Equifax mailed Alston the results of its investigation, then continued to report the Wells Fargo account as delinquent.

In a letter dated August 22, 2011, Alston informed Equifax that she did not agree with the results of its reinvestigation and asked Equifax to send her a description of the procedure it used to reinvestigate the accuracy of the Wells Fargo account.  She included in that correspondence a copy of the Note, payable to Monarch; a July 18, 2011 mortgage statement from Monarch indicating that she owed a balance of $6,492.24 on her mortgage; a mortgage payment coupon for Monarch annotated with "Deed of Trust Book 32280, pp. 487-504;" and a copy of the August 4, 2011 cashier's check, with the same annotation, payable to Monarch Mortgage in the amount of $6,492.24.  Alston Mot. Ex. 14 at 5, ECF No. 112-16.  Equifax received that letter on August 26, 2011.  In response, Equifax sent an ACDV to Wells Fargo reporting that Alston was asserting that "Wells Fargo is neither the owner nor the servicer" of her mortgage.  Alston Mot. Ex. 18, ECF No. 112-20.  Wells Fargo responded by verifying the account and indicating that Equifax should modify its reporting to indicate that, under Alston's "Account Status," the account had been "180 days or more past the due date," but that under "Payment Rating," Alston was then current on the account.  *Id.*  Equifax asserts that it mailed the results of this

reinvestigation to Alston on September 20, 2011; Alston claims that she never received any responsive correspondence from Equifax.

In a letter dated November 9, 2011, Equifax responded to Alston's request for a description of its reinvestigation procedures. That letter stated that "we first review and consider any relevant information" submitted in connection with the dispute. Alston Mot. Ex. 24, ECF No. 112-26. Equifax then "[o]ften" forwards the dispute to the furnisher of the information "for review and investigation." *Id.* If the disputed item is a public record, Equifax instead locates "the most recent filing associated with the disputed information" using procedures "prescribed by the source of the information." *Id.* Equifax noted that it might use a vendor to track down any such public records. Once Equifax has updated information, whether from a furnisher or from public records, it makes deletions or changes to a credit report, as appropriate.

In a letter dated November 21, 2011, Alston disputed Equifax's reporting of the Wells Fargo account for the third time. She noted that Equifax had not provided her the information about its reinvestigation procedures that she had requested in her August letter. She asserted that as a result of Equifax's allegedly erroneous reporting, she was having difficulty getting a car loan, and that the Wells Fargo account was "the only negative account on my credit report." Alston Mot. Ex. 15 at 1, ECF No. 112-17. She again asked that Equifax send her a description of its reinvestigation process. Included with the letter were a "Statement Regarding August Payment" in which Alston explained that she was tendering her payments to Monarch Bank, rather than to Wells Fargo, because Wells Fargo had failed to "produce sufficient documentation to legally enforce the note," as well as the billing statement and cashier's check paperwork she had included with her August 2011 letter. *Id.*

In response, on November 29, 2011, Equifax sent a third ACDV to Wells Fargo, this one noting that Alston "states that in the month of Aug[ust,] Monarch received a cashier cheque of 6492 dollar[s] for Wells Fargo and still the account reports a balance owed of 7303 dollar[s] or more."   Alston Mot. Ex. 19, ECF No. 112-21.  Equifax also noted that Alston had provided a copy of a cashier's check numbered 7000816204 and dated August 4, 2011.  Wells Fargo responded by instructing Equifax to modify its report to reflect that Alston's account had been transferred and that her Payment Rating should reflect that she was 180 or more days past due on the account.  In a letter dated December 21, 2011, Equifax informed Alston of the results of its reinvestigation, notifying her that it had updated its report to reflect that her Wells Fargo mortgage account had been transferred or sold and that as of October 2011, it was 180 days past due.

On February 24, 2012, Alston again pulled her Equifax credit report and saw that Equifax was reporting her Wells Fargo account as 150 days past due in July 2011, current in August 2011, and 180 days past due in September and October 2011, and that the account was transferred or sold in November 2011.  In a letter dated February 28, 2012, Alston lodged a fourth dispute with Equifax about its reporting of the Wells Fargo mortgage.  In that letter, she noted that while her Wells Fargo account was being reported as delinquent, her Monarch mortgage account was "currently" being reported as "PAYS AS AGREED."  Alston Mot. Ex. 16 at 1, ECF No. 112-18.  She asserted that Equifax was also erroneously reporting an overlap in the Wells Fargo and Monarch accounts.  She enclosed with the letter the Monarch mortgage payment coupons for December 2010, January 2011, March through October 2011, December 2011, and January 2012. Each coupon had certain payment information, either the amount due, the payment due date, or both, redacted from its face.  Alston again included the original

promissory note, made out to Monarch, a copy of her 2011 Mortgage Interest Statement from Monarch, and a loan amortization schedule from Monarch.

On March 7, 2012, Equifax sent an ACDV to Wells Fargo stating that Alston asserted that the account information was "inaccurate" and asking Wells Fargo to "verify complete ID and account information."[2] Wells Fargo sent back the same report that it had sent in response to Alston's November 2011 dispute, indicating that Alston's account had been transferred or sold, and that she had been 180 or more days delinquent. In a letter dated March 27, 2012, Equifax sent Alston the results of its reinvestigation, in which it indicated that it had "verified that this item belongs to you." Alston Mot. Ex. 28 at 1, ECF No. 112-30.

In a letter dated April 2, 2012, Alston took issue with the reinvestigation results and asked Equifax to provide her with "an actual description of how the March 2, 2012 dispute was processed," rather than the generic description of its reinvestigation procedures provided in Equifax's November 9, 2011 letter. Alston Mot. Ex. 22, ECF No. 112-24. Specifically, she asked Equifax to inform her whether (1) it had read the documents she included with her dispute, (2) it had forwarded those documents to Wells Fargo, and (3) it had taken "independent investigative steps" or whether it had "just rel[ied] on Wells Fargo." *Id.* Equifax received Alston's letter on April 6, 2012 and, in response, undertook another reinvestigation of the Wells

---

[2] In her Response/Reply to Equifax's Cross-Motion and in her Sur-Reply, Alston argues that Equifax cannot rely on this March 2012 ACDV because it did not produce the document in response to Alston's discovery requests and disclosed it for the first time during the summary judgment briefing. Relatedly, Alston also seeks to exclude from consideration the Declaration of Latonya Munson, an Equifax employee, because Munson purportedly attests to facts of which she did not have personal knowledge. The Court need not resolve these disputes because in ruling on the Motions, the Court does not rely on the March 2012 ACDV, and it relies only upon paragraphs 41, 52-55, and 69-70 of the Munson Declaration, which describe Equifax's general procedures and credit report terminology about which Munson, who has worked for Equifax for over 11 years, has personal knowledge.

Fargo account. On April 25, 2012, Wells Fargo verified the account again and mailed the results of its reinvestigation to Alston. That correspondence did not include any information about Equifax's reinvestigation process.

In a letter dated May 29, 2012, Alston complained to Equifax that it had not provided her with the information she requested in her April 2, 2012 letter about its reinvestigation process within 15 days and asserted that Equifax had thereby violated the Fair Credit Reporting Act. On June 4, 2012, Equifax sent Alston the same letter explaining its standard reinvestigation procedures that it had sent to her on November 9, 2011.

As of November 17, 2015, Equifax was no longer reporting the Wells Fargo mortgage account on Alston's credit report.

## II.    The Discover Account

In November 2010, Alston was informed by her mortgage loan officer that "a derogatory Discovery card" was listed on her Equifax credit report. Alston Decl. ¶ 5, ECF No. 113. In March 2011, Alston contacted Discover about the account, which belonged to her mother, Yvonne Alston, and was told that the account was appearing on her credit report because she was an authorized user of the card. According to Alston, she "never possessed or used a Discover credit card belonging to Yvonne Alston." *Id.* ¶ 3. She therefore asked Discover to remove her from the account, which, Alston asserts, Discover agreed to do.

On June 30, 2011, Alston checked her Equifax credit report and found that she was being reported as an authorized user of her mother's Discover account. Alston's credit report indicated that Alston's mother had a balance of $10,838 on the card, that her last payment was in April 2007, and that Discover had "charged off" the account. Alston Mot. Ex. 2, ECF No. 112-4. On July 5, 2011, Alston contacted Discover again, and was "assured" that "her name had been

9

removed from the account." Alston Decl. ¶ 8. On July 12, 2011, Alston submitted a dispute to Equifax about the Discover account on the grounds that "[t]his account does not belong to me." Alston Mot. Ex. 3, ECF No. 112-5. In response to Alston's dispute, Equifax submitted an ACDV to Discover on which it noted that Alston was asserting that the account was "not his/hers" and asking Discover to "provide complete ID." Alston Mot. Ex. 10, ECF No. 112-12. Discover verified Alston's association with the account but instructed Equifax to alter its report to indicate that her association with the account had been terminated, which it indicated by inserting a "T" code on the ACDV. Equifax accordingly changed the Account Owner/Whose Account information from "Authorized User" to "Association Terminated," and informed Alston of the change in a letter dated August 9, 2011. Alston Mot. Ex. 4, ECF No. 112-6.

In a letter dated August 22, 2011, Alston disputed Equifax's reinvestigation results, noting that "Discover agrees that the account should be deleted" and that Trans Union, another CRA, had already deleted the account from its records. Alston. Mot. Ex. 5 at 1, ECF No. 112-7. She included with her letter a copy of correspondence from Trans Union indicating that it had deleted the Discover account. Alston also asked Equifax to provide a description of its reinvestigation procedure. On August 27, 2011, Equifax sent a second ACDV to Discover, incorporating information from Alston's letter. That ACDV noted that Alston "claims account closed by consumer" and asked Discover to "update compliance condition code, account status, date closed, and payment rating." Alston Mot. Ex. 11, ECF No. 112-13. Discover responded by verifying Equifax's report without modification.

On November 1, 2011, Alston sent a letter to Discover explaining that she had twice been assured by customer service representatives that her name had been removed from the account, but that the account continued to appear on her Equifax report. In a form letter to Alston dated

November 14, 2011, Discover checked one of seven pre-printed options to indicate that it had updated her credit bureau file by removing her name from the account. Other options, none of which were checked, included that Discover had "removed this account from your credit file." Alston Mot. Ex. 7 at 2, ECF No. 112-9.

On January 17, 2012, Alston again accessed her Equifax credit report. The Discover account was still listed on the report, with the same notation of "terminated." Alston Mot. Ex. 6, ECF No. 112-8. In a February 6, 2011 letter to Equifax, Alston again disputed Equifax's reporting of the Discover account, asserting that "Discover has indicated to me that Equifax has been advised to delete this account from my credit report" and asking Equifax to delete the account. Alston Mot. Ex. 7. She enclosed with her letter a copy of the November 14, 2011 letter from Discover. On February 14, 2012, Equifax sent a third ACDV to Discover noting that "consumer states inaccurate information," that "consumer has provided document from Discover Financial Services dated 11-14-2011 stating that we have removed your name from this account," and asking Discover to "verify complete ID and account information." Alston Mot. Ex. 12, ECF No. 112-14. In response, Discover instructed Equifax to "Delete Account." *Id.* In a letter dated March 3, 2012, Equifax informed Alston that it had deleted the account from her credit file.

### III.   Procedural History

On March 14, 2013, Alston filed suit in the Circuit Court of Maryland for Prince George's County alleging two causes of action, one under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§1681-1681x (2012), and the other under the Consumer Credit Reporting Agencies subtitle of Maryland's Miscellaneous Consumer Protection Provisions ("MCPP"), Md. Code Ann., Commercial Law, §§ 14-1201–14-1218 (2013). On October 28, 2013, Alston

11

amended her Complaint. In the Amended Complaint, she continues to assert causes of action under the FCRA and the MCPP. Specifically, she alleges that Equifax violated the following provisions of the FCRA: 15 U.S.C. § 1681e(b) and 15 U.S.C. §§ 1681i(a)(1), (2), (4), (5)(A), and (7). She does not specify whether those alleged violations were the result of Equifax's handling of her Wells Fargo account, her Discover account, or both. Alston also asserts that Equifax violated the MCPP provisions contained in sections 14-1208(a) and (b) of the Maryland Commercial Code, but again does not specify if those alleged violations were the result of Equifax's handling of her Wells Fargo account, her Discover account, or both. On September 25, 2015, Alston moved for partial summary judgment on her FCRA claims, making no mention of her MCPP claims. On October 23, 2015, Equifax cross-moved for summary judgment on all claims.

## DISCUSSION

### I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v.*

*Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II.    The Wells Fargo Mortgage

In her Motion for Partial Summary Judgment, Alston clarifies that, as to the Wells Fargo account, she is alleging that Equifax violated 15 U.S.C. § 1681e(b) and 15 U.S.C. § 1681i(a)(1)(A), (2)(A), (4), (5)(A)(i), and (7).  Alston also alleges, for the first time, that, in its reinvestigation of the Wells Fargo account, Equifax violated § 1681i(a)(6)(A), which requires written notice of the results of a reinvestigation within five days.  As a threshold matter, the Court does not consider Alston's belated assertion of a claim under § 1681i(a)(6)(A).  That claim was not alleged in the original or the amended Complaint, so Alston cannot assert it in the first instance on summary judgment.  *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314 (8th Cir. 2004) (emphasizing that the "liberal pleading standard" of Rule 8 "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage").

Turning to the claims that Alston did properly allege in her Amended Complaint, § 1681e(b) requires CRAs to "follow reasonable procedures to assure maximum possible accuracy" of information contained in credit reports. 15 U.S.C. § 1681e(b).  The United States Court of Appeals for the Fourth Circuit has interpreted § 1681e to include an inaccuracy requirement, such that in order to establish a violation of § 1681e, a plaintiff must show both "(1) the consumer report contained inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001).  Other circuits have adopted the same

requirement of inaccuracy. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 964 (3d Cir. 1996); *Guimond v. Trans Union*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 39 (D.C. Cir. 1984).

While § 1681e governs the original compilation of information for a credit report, §1681i sets out requirements for CRAs in conducting reinvestigations of disputed information, including the following requirements:   to conduct a reasonable reinvestigation, as required by § 1681i(a)(1); to provide all relevant information about the dispute to the furnisher of the disputed credit information, as required by § 1681i(a)(2); to review and consider all relevant information provided by the consumer, as required by § 1681i(a)(4); to delete promptly any information found to be inaccurate or incomplete, as required by § 1681i(a)(5); and to provide to a consumer, upon request, a description of the CRA's reinvestigation procedure within 15 days of the request, as required by § 1681i(a)(7).

The Fourth Circuit has not specifically addressed whether inaccuracy of a credit report is an element of a violation of 15 U.S.C. § 1681i, but several circuits have held that the statute implicitly includes such a requirement. In *Carvalho v. Equifax*, 629 F.3d 876 (9th Cir. 2010), the United States Court of Appeals for the Ninth Circuit held that although §1681i "does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim," such an inaccuracy is a requirement to establish liability. *Id.* at 890.  The court reasoned that such a requirement is consistent with the overall purpose of the FCRA "to protect consumers from the transmission of inaccurate information about them." *Id.* (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009)).   At least two other circuits have specifically held that inaccuracy is a requirement for claims made under § 1681i. *See DeAndrade v. Trans Union*, 523

F.3d 61, 66-68 (1st Cir. 2008); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). Following such precedent from other circuits and the reasoning in *Dalton* as to § 1681e, judges in this district have adopted the inaccuracy requirement for § 1681i claims. *See, e.g., Brooks v. Midland Credit Management*, WDQ-12-1926, 2013 WL 1010455 at *7 (D. Md. Mar. 13, 2013) ("Inaccurate information is an element of a claim under §§ 1681e(a) and 1681i(a)"); *Brown v. Experian*, JKB-12-2048, 2012 WL 6615005 at * 3 (D. Md. Dec. 17, 2012) ("In order to state a claim for failure to comply with § 1681e(b), Plaintiff must allege that a consumer report contained inaccurate information. The same is true of § 1681i(a)." (internal citation omitted)).

Such a requirement is consistent with the purposes of the FCRA, which is focused on preventing inaccurate credit reports from harming individual subjects of those reports. *See Dalton*, 257 F.3d at 414 ("Congress found that in too many instances agencies were reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment."). Section 1681i itself focuses on this purpose, in that it requires a credit reporting agency "to conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a). If the disputed information proved to be accurate, there would be no unfair harm to the subject of the credit report, regardless of the scope and effectiveness of any reinvestigation. Thus, this Court holds, consistent with the weight of precedent, that inaccuracy of the credit report is a necessary element of a successful claim under § 1681i.

The inaccuracy requirements of § 1681e and § 1681i doom Alston's claims stemming from Equifax's reporting of her Wells Fargo mortgage account. In *Alston v. Wells Fargo*, No. TDC-13-3147, this Court was squarely presented with the question whether Wells Fargo, as a

15

furnisher of credit information, was liable under the FCRA for inaccurately reporting Alston's mortgage payment history. The Court determined, on summary judgment, that Wells Fargo's reporting of Alston's mortgage account was accurate because the uncontradicted evidence established that Wells Fargo was entitled to collect payments on that mortgage during the period of reported delinquency and because, during that period, Alston made no legal payments on the mortgage, either to Wells Fargo or to Monarch. *Alston v. Wells Fargo*, No. TDC-13-3147, 2016 WL 816733 at * 9 (D. Md. Feb. 26, 2016).

The determination in *Alston v. Wells Fargo* that Wells Fargo accurately reported Alston's mortgage as delinquent, which was the central issue in that case, is controlling here because Alston was a party to that case and had a full opportunity and the same incentive to litigate that issue. Alston is thus estopped from relitigating that question here. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (stating that issue preclusion bars a party that "had a full and fair opportunity to litigate" from engaging in "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim"); Restatement (Second) of Judgments § 27 (2016) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim"); *id.* § 29 ("A party precluded from relitigating an issue with an opposing party, in accordance with [§ 27] is also precluded from doing so with another person[.]")

Even if the Court were to revisit this issue, the same evidence the Court relied upon to make that determination is before it again on these Motions. A review of the record leads the Court to the same conclusion about the validity of the Wells Fargo mortgage account, Alston's

lack of valid mortgage payments, and thus the accuracy of Wells Fargo's reports of delinquency. The uncontradicted evidence establishes that Wells Fargo purchased Alston's mortgage from Monarch on December 16, 2010. Monarch then transferred possession of the promissory note underlying that mortgage to Wells Fargo before January 20, 2011. Because Monarch did not successfully endorse the Note over to Wells Fargo, at that point Wells Fargo was not the "holder" of the Note. But by January 20, 2011 at the latest, Wells Fargo was a nonholder in possession of Alston's promissory note who had the rights of the holder. *See Anderson v. Burson*, 35 A.3d 452, 461 (Md. 2011). Under Maryland Commercial Law § 3-301, Wells Fargo was thus entitled to demand from Alston her February 1, 2011 mortgage payment as well as all of the subsequent payments.

Although Alston contends that she was making her required payments to Monarch while she was contesting the validity of Wells Fargo's claim that it owned her loan, the documentary record tells a different story. On the day she closed on her mortgage, Alston executed a unilateral Rider to the Deed of Trust that would radically change the terms of the loan in her favor, providing that "[a]ny offset or claim which Borrower has now or in the future against Lender shall relieve Borrower from making payments due under the Note." Alston Rider, Prince George's County Land Records, Book 32280 at 502. Alston's Rider, if adopted, would essentially allow her to discharge her loan. Alston then made all of her payments to Monarch conditioned on Monarch's acceptance of her secret, unilateral terms, first by expressly annotating her checks to state as much, then by annotating the payments with the land record citation to the Rider. It is these conditional payments that Alston cites to prove that, throughout the period when Wells Fargo was her loan servicer, she dutifully tendered mortgage payments to Monarch. However, "a tender that contains a condition which would prejudice the creditor's rights is

invalid." *Cochran v. Griffith Energy Service, Inc.*, 993 A.2d 153, 167 (Md. Ct. Spec. App. 2010). *See also Heighe v. Sale of Real Estate*, 164 A. 671, 674 (Md. 1933) (holding that a mortgage holder was not required to accept mortgage payments unless the "tender" was "unconditional"). Here, Alston's tendered payments would not merely have prejudiced the rights of Monarch or Wells Fargo, they would have essentially extinguished them. These "payments" were therefore not valid as a matter of law.

Because none of the payments that Alston made from December 2010 to October 2011 was legally valid, Wells Fargo's reporting of that account as delinquent during that period was completely accurate. The fact that Wells Fargo, when faced with the August cashier's check, initially reported Alston to be current for that month, does not alter this conclusion. A credit report can be deemed "inaccurate" under the FCRA only if it is "patently incorrect" or when it is "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Dalton*, 257 F.3d at 415 (internal quotation marks, punctuation, and citation omitted). Wells Fargo was faced with the legal question whether the August 2011 cashier's check containing Alston's confusing and misleading annotations was a legally valid payment, and it gave Alston the benefit of the doubt on that question. Wells Fargo's provisional determination to credit her as current in August 2011 therefore cannot be deemed patently incorrect. *See Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) (noting that an FCRA claim requires a "showing [of] *factual* inaccuracy, rather than the existence of disputed legal questions" (internal quotation marks and citation omitted)). The reporting that her account was current for a particular month also cannot be construed as having an adverse effect on Alston.

The uncontradicted evidence establishes that Equifax reported the information that Wells Fargo provided, and Alston makes no claim to the contrary. Thus, because Wells Fargo's

information was accurate, Equifax's reporting of the information it received from Wells Fargo was also accurate. Alston therefore cannot succeed on either her § 1681e or her § 1681i claim.

To the extent that Alston argues that the credit reporting was inaccurate because Wells Fargo had no right to collect her mortgage payments, such a claim fails both because, as discussed above, the Court finds that the evidence establishes that Wells Fargo had a such a right, and because that claim would exceed the scope of the FCRA as it relates to CRAs. *See Carvalho*, 629 F.3d at 892 ("We agree that reinvestigation claims [under § 1681i] are not the proper vehicle for collaterally attacking the legal validity of consumer debts.").

Alston's Motion for Partial Summary Judgment is therefore denied as to her claims arising from the Wells Fargo account, and Equifax's Cross-Motion for Summary Judgment in its favor on those claims is granted.

## III.    The Discover Account

### A.    Scope of Claims

Alston seeks summary judgment on her claims that Equifax's reinvestigation activities relating to the Discover account violated the FCRA. In her Amended Complaint, Alston generally alleged violations of 15 U.S.C. §§ 1681e(b), 1681i(a)(1), (2), (4), (5)(A), and (7), but she did not correlate specific statutory provisions to her claims relating to the Wells Fargo account or the Discover account. In her Motion, she makes no mention of claims under § 1681e(b) or § 1681i(a)(7) relating to the Discover account. In its Cross-Motion seeking summary judgment in its favor on all claims, Equifax notes that Alston makes no arguments that Equifax is liable under § 1681e(b) as to the Discover account. Equifax also seeks summary judgment on Alston's claims under § 1681i(a) but specifically addresses the merits of only those subsections enumerated by Alston in her Motion, namely her claims under §1681i(a)(1), (2), (4),

and (5)(A).  In her Response/Reply to that Motion, as well as in her sur-reply briefing, Alston

never contends that she has alleged claims relating to the Discover account under either § 1681e

or § 1681i(a)(7).  The Court therefore construes the Amended Complaint's assertions of claims

under § 1681e and § 1681i(a)(7) as relating to the Wells Fargo account only.  To the extent that

Alston intended to assert such claims as to the Discover account, the substance of Alston's

Motion and her silence in response to Equifax's characterization of her claims relating to the

Discover account establish that she has since abandoned them.  *See Satcher v. Univ. of Ark. at*

*Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (holding that "failure to oppose a

basis for summary judgment constitutes waiver of that argument"); *Mentch v. Eastern Sav. Bank,*

*FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that the plaintiff had abandoned a claim

"by failing to address that claim in her opposition to [the defendant's] motion for summary

judgment, or to offer clarification in response to [defendant's] reply brief").

    In any event, the Court notes that Equifax would be entitled to summary judgment on any

§ 1681e(b) claim.  Under that provision, CRAs must follow "reasonable procedures to assure

maximum possible accuracy" when preparing a credit report.  15 U.S.C. § 1681e(b).  "Section

1681e(b) of the FCRA deals with the credit reporting agency's duty in preparing the initial

report, which is distinct from the agency's duty to reinvestigate once a consumer has identified

allegedly inaccurate information." *Wilson v. Rental Research Svcs.*, 165 F.3d 642, 644 (8th Cir.

1999).  Here, all of the evidence offered by Alston addressed the reasonableness of Equifax's

reinvestigation of the Discover account after she filed disputes.  The record contains no evidence

that would permit the conclusion that Equifax failed to follow reasonable procedures in

originally preparing Alston's credit report as to the Discover account.  Thus, Equifax would be

entitled to summary judgment on a § 1681e(b) claim as to the Discover account.  *See Goldsmith*

*v. Mayor and City Council of Baltimore*, 987 F.2d 1064, 1071 (4th Cir. 1993) (affirming the district court's grant of summary judgment to the defendants because the plaintiff's "claims are factually unsupported"); *Wilson v. Cargo Group, Inc.*, 518 F.3d 40, 42 (D.C. Cir. 2008) (reiterating its prior holding that to succeed on a claim under § 1681e(b), a plaintiff must "minimally present *some* evidence from which a trier of fact can infer that the consumer reporting agency failed to follow reasonable procedures in preparing a credit report (quoting *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C. Cir. 1984)).

**B.     15 U.S.C. § 1681i(a)**

As discussed above, to succeed on claims under § 1681i(a), a plaintiff must make a threshold showing of inaccuracy. *See supra* part II.  Here, Alston asserts in her Declaration that she was never an authorized user of her mother's Discover account, and Equifax does not explicitly dispute that assertion.  Because Equifax was reporting Alston as an authorized user of that account, Alston has, at a minimum, established a genuine issue of material fact that the report was inaccurate.

The question then shifts to the reasonableness of the procedures Equifax used to reinvestigate Alston's disputes about the Discover account. Section 1681i(a)(1) establishes the general requirement that consumer reporting agencies must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5)" within 30 days of the filing of the dispute. 15 U.S.C. § 1681(a)(1)(A).  The other subsections of § 1681i(a) that Alston claims were violated provide additional detail on the required procedures for conducting a reasonable reinvestigation. As relevant here, § 1681i(a)(2) requires CRAs to provide furnishers of credit information "all relevant information regarding the dispute" that the

CRA received from the consumer. 15 U.S.C. § 1681i(a)(2)(A) and (B). Section 1681i(a)(4), in turn, requires the CRA itself to "review and consider all relevant information" submitted by the consumer. 15 U.S.C. § 1681i(a)(4). Section 1681i(a)(5) then requires CRAs promptly to delete or modify any account information that the reinvestigation reveals to be either "inaccurate or incomplete," or which "cannot be verified." 15 U.S.C. § 1681i(a)(5)(A).

Determining whether a CRA's reinvestigation procedures were reasonable requires balancing "the cost of verifying the accuracy of the information" against "the possible harm of reporting inaccurate information." *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 432-33 (4th Cir. 2004) (noting that this balancing test is used to analyze the reasonableness of CRAs' reinvestigation procedures and holding that the same test applies when analyzing the reasonableness of the investigation procedures of furnishers of credit information). As the Fourth Circuit noted, "creditors and credit reporting agencies have different roles and duties in investigating consumer disputes under the FCRA." *Id.* That difference is reflected in the language of the FCRA itself, which obligates creditors or furnishers of credit information to "conduct an investigation with respect to the disputed information," 15 U.S.C. § 1681s-2(b)(1)(A), but requires consumer reporting agencies, such as Equifax, to conduct a "*re*investigation," 15 U.S.C. § 1681i(a)(1)(A) (emphasis added). In parsing this distinction, the Ninth Circuit has noted that, "as the statute recognizes, the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1156 (9th Cir. 2009). "[T]he CRA is a third party, lacking any direct relationship with the consumer," so the reasonableness requirement attached to a CRA's duty to reinvestigate "limits its obligation on account of its third-party status and the fact that it is repeating a task already completed once."

*Id.* at 1157; *see also Henson v. CSC Credit Svcs.*, 29 F.3d 280, 287 (7th Cir. 1994) (noting that a CRA has a duty to go beyond the original source of credit information only in certain circumstances, such as when it is on notice that the source is unreliable).

Turning to this case, the Court notes first that while reasonableness is "normally within the province of the fact-finder, summary judgment may be appropriate where a plaintiff has failed to adduce evidence that would tend to prove that [a] CRA's investigation was unreasonable." *Wu v. Trans Union*, No. AW-03-1290, 2006 WL 4729755 at * 8 (D. Md. May 2, 2006), *aff'd sub nom. Wu v. Equifax*, 219 F. App'x 320, 320 (4th Cir. 2007) (per curiam) (affirming "for the reasons stated by the district court"). That is the situation here. As an initial matter, the parties agree on all material elements of the sequence of events, so there are no factual disputes for a jury to resolve. What the parties disagree on is the significance of those events, namely whether the reinvestigations Equifax conducted can be deemed unreasonable. After viewing the facts through the balancing test in *Johnson*, the Court concludes that there is no meaningful factual dispute as to reasonableness that must be presented to a trier of fact.

The Court first considers the possible harm to Alston of Equifax's reporting of her Discover account. On this score, Alston makes a paltry showing. In her Declaration, she asserts that in November 2010, her mortgage loan officer informed her that there was a "derogatory" Discover account on her credit report. Alston Decl. ¶ 5. The reporting, however, listed her only as an authorized user of her mother's credit card account. It did not assert that she was the account holder or responsible for payments on the account. Conspicuously absent from Alston's Declaration is any accompanying statement that the reporting of the Discover account affected her in any way, whether by preventing her from getting a loan entirely or by preventing her from getting more competitive rates for a loan. In fact, in November 2011, Alston affirmatively stated

to Equifax, in a letter relating to her Wells Fargo mortgage, that the Wells Fargo account was "the only negative account on my credit report." Alston Mot. Ex. 15 at 1. Alston thus acknowledged, in the midst of her dispute with Equifax about the Discover account, that Equifax's reporting of that account did not constitute negative information and had no negative impact on her. Thus, if the reporting of that account was inaccurate as a technical matter, it was not inaccurate in the more robust sense about which the Fourth Circuit expressed concern in *Dalton*, where it noted that the FCRA was passed in response to the "reporting [of] inaccurate information *that was adversely affecting the ability of individuals to obtain employment.*" 257 F.3d at 414 (emphasis added).

Against this very limited harm, the Court must weigh the efforts Equifax undertook to reinvestigate the account. Over the course of eight months, from July 12, 2011 to March 3, 2012, Alston filed three disputes with Equifax related to the Discover account. Each time, Equifax responded by sending an ACDV to Discover, and after the third one, Equifax deleted the account from Alston's credit report.

In her first dispute, on July 12, 2011, when Alston asserted, "This account does not belong to me," Equifax informed Discover that Alston was asserting that the account was "not his/hers" and accordingly asked Discover to "provide complete ID." Alston Mot. Exs. 3, 10. When Discover responded by noting Alston's association with the account had been terminated, Equifax made a corresponding change to her credit report.

In her second dispute, on August 22, 2011, when Alston asserted that "Discover agrees that the account should be deleted" and provided a letter from Trans Union indicating that it had deleted the account, Equifax informed Discover that Alston was asserting that the "account [was] closed by consumer," and asked Discover to "update compliance condition code, account status,

24

date closed, and payment rating." Alston. Mot. Ex. 5 at 1; *id.* Ex. 11. Discover did not propose any change to the report, and Equifax made none.

In her third dispute, on February 6, 2012, when Alston maintained that, "Discover has indicated to me that Equifax has been advised to delete this account from my credit report" and this time enclosed a letter from Discover stating that it had "removed [her] name from this account," Equifax informed Discover that "consumer states inaccurate information," that "consumer has provided document from Discover Financial Services dated 11-14-2011 stating that we have removed your name from this account," and asked Discover to "verify complete ID and account information." Alston Mot. Exs. 7, 12. In response to this ACDV, Discover advised that the account should be deleted from the credit report, and Equifax promptly did so.

The ACDVs and subsequent course of events generally indicate that Equifax reviewed and considered the information submitted by Alston, forwarded such information to Discover, and promptly modified or deleted information in the credit report once it learned that it was inaccurate, incomplete, or unverified. *See* 15 U.S.C. § 1681i(a)(2), (4), (5). Equifax generally tailored each ACDV to Alston's specific allegations, thereby indicating that Equifax itself had reviewed the submitted information and conveyed its substance to Discover. *See* 15 U.S.C. § 1681i(a)(4); *Wu*, 2006 WL 4729755 at * 8 ("While the CDVs did not include all of the Plaintiff's arguments to justify his late payments, these forms contained enough information for the creditors to investigate Plaintiff's disputes."). As a result, the ACDVs not only gave Discover notice that Alston had a dispute, but also provided notice of the nature of that dispute, thereby enabling Discover to investigate those claims, which it was, as the grantor of the disputed account, in "far better position" than Equifax to do. *Gorman*, 584 F.3d at 1156; *see* 15 U.S.C. §

1681(a)(2).   When Discover advised that changes should be made, including deleting the account, Equifax took the proposed action. *See* 15 U.S.C. § 1681i(a)(5).

While "exclusive reliance on ACDV procedures does not suffice, as a matter of law, to establish that a reasonable investigation took place," *Grigoryan v. Experian*, 84 F. Supp. 3d 1044, 1074 (C.D. Cal. 2014), courts have granted summary judgment in favor of a CRA where the facts relating to its use of ACDVs do not support a finding that its reinvestigation was unreasonable.   In *Wu*, the court granted summary judgment in favor of the CRA where the CRA's reinvestigation consisted of sending to creditors two different ACDVs summarizing the plaintiff's claims that he had not made late payments, making no changes when the creditors verified their information, and deleting accounts when the creditors did not respond.   2006 WL 4729755 at *1-2, 8.  In *Paul v. Experian Information Solutions*, 793 F. Supp. 2d 1098, 1103 (D. Minn. 2011), the court granted summary judgment to a CRA which, after receiving a letter from a bank stating that an account should not have been reported as past due, sent the bank an ACDV summarizing the contents of the letter, then left in place information on past delinquencies verified by the bank.   *Id.* at 1099-1101, 1103.  Here, where Equifax likewise applied the ACDV process in accordance with the relevant provisions of § 1681i(a) and deleted the account when instructed to do so by Discover, summary judgment in its favor is warranted because the reinvestigation process was reasonable.

Equifax's timely and appropriate use of ACDVs, and its correction of information in response to Discover's input, stand in contrast to CRA reinvestigations in cases where the question of reasonableness was submitted to a jury.   In such cases, the CRA typically fails to include in its ACDV critical information about the dispute that the creditor would need to conduct its investigation.   *See Grigoryan*, 84 F. Supp. 3d at 1075-76 (denying summary

judgment where, as part of a two-year dispute with a CRA over reported late payments, the plaintiff provided payment receipts, but that information was not included in the ACDVs sent to the creditors); *Bradshaw v. BAC Home Loans Servicing, L.P.*, 816 F. Supp. 2d 1066, 1070, 1074 (D. Or. 2011) (denying summary judgment because the ACDVs listed only a general reason for plaintiffs' dispute and failed to include or summarize a loan modification agreement and transaction history document showing that the plaintiffs had been making monthly payments in accordance with the modification before it was rejected); *Krajewski v. Am. Honda Finance Corp.*, 557 F. Supp. 2d 596, 617 (E.D. Pa 2008) (denying summary judgment where the ACDVs asked the creditor only to "verify all account information" where the plaintiff had specifically asserted that her report incorrectly included late payments).

Here, Alston's main complaint about the content of the ACDVs is that Equifax failed to include in its August 2011 ACDV a copy of her letter from Trans Union indicating that it had deleted the Discover account, or to otherwise to report this fact to Discover. But CRAs have no obligation to forward the specific documents that consumers provide regarding their disputes. *See Paul*, 793 F. Supp. 2d at 1103 ("No language in the statute requires a CRA to forward documents to data furnishers to satisfy its obligation.") (citing Fed. Trade Comm'n, *Report to Congress on the Fair Credit Reporting Act Dispute Process* ("FTC Report") at 18 n. 117 (Aug. 2006), which describes the logistical and privacy problems that would ensue from such a requirement); *Bradshaw*, 816 F. Supp. 2d at 1075   (rejecting "plaintiffs' argument that defendants were required to send physical or digital copies of plaintiffs' documents" to the creditor). Nor was it necessary for Equifax to inform Discover that Trans Union had deleted the account, or to contact Trans Union itself. According to the Declaration of Latonya Munson, an Equifax representative, Equifax does not and cannot rely on the position of another CRA in

assessing whether reported information is accurate, and there was nothing in Trans Union's letter indicating that it possessed any specific facts unknown to Discover or Equifax that would establish the inaccuracy of the Equifax report.

Having failed to establish unreasonableness in Equifax's application of the ACDV process, Alston asserts that Discover's reporting was so patently unreliable that Equifax was "obligated to go beyond Discover as its source for its investigation, or to delete the account." Alston Mot. at 18. Alston's assertion of unreliability is based primarily on her claim that having received Discover's initial instruction, after the first ACDV, to note that Alston had been terminated as an authorized user, Equifax had to know that it needed to delete the Discover account, even though Discover did not specifically instruct it to do so until after the third ACDV. However, as noted by Munson, the fact that a creditor reports that an individual's right to use an account has been terminated does not mean that the individual was never an authorized user, nor does it mean that the historical reporting of the individual's prior role with the account would not be useful information to creditors. Alston's own evidence illustrates this point. The November 2011 letter from Discover, which Alston submitted to Equifax in February 2012 as part of her third dispute, contained several check box options to indicate a change in her credit file. In that letter, Discover checked the item to indicate that it had "removed [her] name from this account." Alston Mot. Ex. 7 at 2. It conspicuously did not select the option to indicate "removed this account from your credit file." *Id.* This document illustrates that the decision to remove someone as a listed authorized user does not necessarily mean that it is appropriate to delete the account from her credit report entirely. Thus, Discover's initial instruction to terminate Alston as an authorized user did not put Equifax on notice that it could not rely on Discover's information. Indeed, given that this letter did not even indicate that Discover had itself deleted

28

the account from Alston's credit file, as Alston had claimed, Equifax acted reasonably in waiting until Discover specifically advised after the third ACDV that it should delete the account.

Finally, Alston claims that Equifax's reinvestigations were inadequate because there were additional steps outside the ACDV process that Equifax should have undertaken. Her own suggestions on this score dismantle the argument. She asserts that "Equifax could have contacted Plaintiff, or contacted Plaintiff's mother or even contacted Trans Union, to further investigate the association between Plaintiff and the Discover account." Alston Mot. at 19: It is difficult to see how any of these lines of investigation would have proven fruitful. As discussed above, Trans Union had no direct knowledge of Alston's role with the Discover account. Contacting Alston herself would be a redundancy, since Alston had already disputed the account and provided the basis for that dispute. Given the familial relationship, a discussion with Alston's mother would almost certainly have been insufficient to establish definitively that Alston had never been authorized to make charges on the Discover account. Accordingly, as in *Wu*, the only way for Equifax to verify whether Alston was an authorized user on the Discover account was to engage directly with Discover. *See* 2006 WL 4729755 at *8.

The facts here are thus very different from cases in which courts have rejected claims by CRAs that they were entitled to judgment as a matter of law on the reasonableness of a reinvestigation, because in such cases there were clear, concrete steps the CRA could have taken, but failed to take, to verify the plaintiff's claim of erroneous information in a credit report. *See Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1070 (9th Cir. 2008) (*en banc*) (granting summary judgment to the plaintiff where the plaintiff had disputed a CRA's reporting of a civil judgment against him because the CRA could have, but did not, check the Civil Register "which can be viewed free of charge on the Los Angeles Superior Court's excellent website" and which

"clearly indicat[ed] that the case against the plaintiff had been dismissed); *Dixon-Rollins v. Experian Info. Solutions, Inc.*, 753 F. Supp. 2d 452, 458 (E.D. Pa. 2010) (denying the CRA's motion for judgment as a matter of law after a jury trial because it was "not unreasonable for the jury to conclude" that where the plaintiff disputed an alleged unpaid rent debt listed on her credit report for two years, the CRA's failure to contact the plaintiff's apartment complex and thus learn that the rent debt had been settled rendered the CRA's investigation unreasonable); *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582, 585, 589 (E.D. Pa. 2003) (denying summary judgment because for six years the CRA failed to correct an erroneous listing of a small claims judgment against the plaintiff when it refused to accept copies of court records submitted by the plaintiff and did not itself consult court records showing that the judgment was actually in her favor). Having identified no such untapped source of information, Alston's claim of an unreasonable investigation fails.

Ultimately, in viewing this factual record, the Court sees no meaningful distinction between this case and *Wu*. Equifax verified the Discover account by sending ACDVs to Discover, and those ACDVs "contained enough information for [Discover] to investigate [Alston's] disputes." *Wu*, 2006 WL 4729755 at * 8. There was nothing about Discover's reporting that was inherently unreliable, and there were no other steps that Equifax reasonably should have taken. Equifax responded to Discover's information by twice modifying the credit report, including deleting the disputed entry less than eight months after the first ACDV. Alston, meanwhile, has never indicated how Equifax's reporting of the Discover account had a negative impact on her. Balancing the cost of verifying the accuracy of the information against the harm of reporting inaccurate information, the Court concludes that no reasonable jury could find that Equifax's actions here amounted to an unreasonable reinvestigation.

## IV.    State Law Claims

In its Cross-Motion for Summary Judgment, Equifax sought summary judgment as to Alston's MCPP claims, asserting that those claims fail for the same reasons that the federal claims fail and because Alston could not prove that she sustained damages, a required element for those claims.  Alston did not respond to Equifax's arguments in favor of summary judgment on the MCPP claims, nor did she attempt to resuscitate those claims in the sur-reply briefing. The Court therefore determines that she has abandoned those claims. *See Satcher* 558 F.3d at 735 (holding that "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *Mentch*, 949 F. Supp. at 1247 (finding that the plaintiff had abandoned a claim "by failing to address that claim in her opposition to [the defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief").

### CONCLUSION

For foregoing reasons, Alston's Motion for Partial Summary Judgment is DENIED, and Equifax's Cross-Motion for Summary Judgment is GRANTED.  A separate Order shall issue.


Date:   September 20, 2016

THEODORE D. CHUANG
United States District Judge